**2017 UT App 214**

## THE UTAH COURT OF APPEALS

RICK O'HEARON,
Appellant,
*v.*
EDWARD HANSEN,
Appellee.

Opinion
No. 20160178-CA
Filed November 24, 2017

Seventh District Court, Price Department
The Honorable George M. Harmond
No. 154700225

David S. Head, Attorney for Appellant

McKette H. Allred, Attorney for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
JILL M. POHLMAN and DIANA HAGEN concurred.

HARRIS, Judge:

¶1      In November 2015, the mother (Mother) of three children
(the Children) was tragically killed in a car accident. For the
preceding eight years, the Children had lived with Mother and
her husband, Rick O'Hearon (Stepfather). Soon after the car
accident, Stepfather filed a petition (the Petition), pursuant to
Utah's Custody and Visitation for Persons Other than Parents
Act (the Act),[1] seeking custody of the Children and asserting that
since 2007 he had "assumed the role and obligations" of the
Children's father. Upon motion from the Children's father
Edward     Hansen     (Father),     the     district     court     dismissed

---

1. The Act is codified at Utah Code Ann. §§ 30-5a-101 to -104
(LexisNexis Supp. 2017).

Stepfather's Petition. The district court determined that the Petition did not allege facts sufficient to meet all of the requirements of the Act, specifically the seventh requirement, which requires Stepfather to prove that Father either (a) "is absent" or (b) "is found by a court to have abused or neglected the child."

¶2    We conclude that Stepfather has—at least for the purposes of review pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure—made allegations sufficient to satisfy all seven of the requirements of the Act. We first conclude that Stepfather has alleged facts that, if true, would meet the first six requirements of the Act. We then analyze the seventh requirement of the Act in detail, and conclude that Stepfather has not sufficiently alleged that Father "is found by a court to have abused or neglected the child," but that Stepfather has alleged facts that, if proven to be true, may meet the Act's requirement that Father "is absent." In reaching this conclusion, we determine that the phrase "is absent" contemplates a present-tense inquiry, not a backward-looking inquiry, and requires a petitioner to prove that the parent is, at the time of the filing of the petition, currently not present for the purposes of parenting the children. Accordingly, because we conclude that Stepfather has alleged facts sufficient to potentially meet all seven requirements of the Act, we reverse the district court's order dismissing the Petition for failure to state a claim upon which relief can be granted.

BACKGROUND

¶3    Because this case comes to us after dismissal of the Petition pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure, we recite the facts as set forth in the Petition, and accept that the facts alleged therein are true. *See Williams v. Bench*, 2008 UT App 306, ¶ 2 n.2, 193 P.3d 640.

¶4      Between 2007 and the time of filing of the Petition, the Children resided with Mother and Stepfather in Stepfather's home. During those years, Mother and Stepfather "provided exclusive care" for the Children, and Stepfather "assumed the role and obligations" of the Children's father and "emotionally and financially cared for" the Children. In so doing, Stepfather "developed an emotional bond and a parent-child relationship" with the Children.

¶5      On the other hand, according to the Petition, Father "has been absent from" the Children's lives and has "only sporadically visited" the Children. Indeed, Father "rarely visited the minor children and when [Father] did visit . . . it was limited to an hour visit, once a month." In addition, Father "has neglected" the Children "by leaving them in [Stepfather's] care since 2007 and [by] not providing for their emotional and physical needs." In the Petition, Stepfather also alleged that Father "does not have a stable residence for the minor children to reside [in]" and that Father "is incapable of caring for the minor children on his own."

¶6      Following Mother's death, Stepfather did not seek to wholly terminate Father's parental rights.[2] Instead, Stepfather

---

2. Based on the facts alleged in his Petition, this may have been an option for Stepfather pursuant to the Termination of Parental Rights Act. *See* Utah Code Ann. §§ 78A-6-501 to -515 (LexisNexis 2012). "Any interested party . . . may file a petition for termination of the parent-child relationship with regard to a child." *Id.* § 78A-6-504(1). A court adjudicating a petition for termination of parental rights "may terminate" those rights if it finds, among other things, that "the parent has abandoned the child." *Id.* § 78A-6-507(1). It is considered "prima facie evidence" of abandonment if the parent has "failed to communicate with the child by mail, telephone, or otherwise for six months." *Id.* § 78A-6-508(1)(b) (LexisNexis Supp. 2017).

filed the Petition, seeking sole legal and physical custody of the Children pursuant to the Act, but not seeking to entirely eliminate Father's opportunity for visitation. Even if a court granted the Petition in its entirety, Father could still obtain an order entitling him to parent-time, because his parental rights would remain intact. In addition to seeking custody, Stepfather also sought an order requiring Father to pay child support and to share equally in paying the Children's medical expenses.

¶7     After being served with the Petition, Father responded by filing a motion to dismiss. Father argued that, although Mother had been awarded sole physical custody of the Children after their divorce, the divorce decree ceased to operate upon Mother's death pursuant to this court's decision in *Nielson v. Nielson*, 826 P.2d 1065 (Utah Ct. App. 1991). He further argued that he had "the right to the sole legal and physical custody and control of the children over [Stepfather], absent termination or suspension of [Father's] parental rights." Because Stepfather had not sought to terminate Father's parental rights, Father asserted that, even assuming the allegations in the Petition were true, dismissal was nonetheless warranted. Father's motion did not reference the Act.

¶8     The district court granted Father's motion to dismiss. In its order the district court discussed the Act and explained that Stepfather could prevail on his Petition only if he could establish all seven of the Act's requirements by clear and convincing evidence, including the seventh one that requires a petitioner to demonstrate either (a) that Father "is absent" or (b) that Father "is found by a court to have abused or neglected the child." *See* Utah Code Ann. § 30-5a-103(2)(g) (LexisNexis Supp. 2017). The district court concluded that Stepfather could not meet this seventh requirement, but limited its analysis to the "is absent" part of that requirement, and determined that Stepfather's allegation that Father had visited the Children "once per month" foreclosed Stepfather's ability to prove that element. The district court stated that, even if this allegation were true, "this pattern is

far too frequent to allow the court to conclude that [Father] has voluntarily absented himself from his children's lives." Therefore, "even construing the complaint in the light most favorable to [Stepfather] and making all reasonable inferences in his favor . . . [Father] has visited his children regularly and thus is not absent under" the Act.

¶9     Stepfather appeals.


ISSUE AND STANDARD OF REVIEW

¶10     The sole issue in this appeal is whether the district court properly granted Father's motion to dismiss. In reviewing a district court's grant of a motion to dismiss for failure to state a claim upon which relief can be granted, we accept all facts alleged as true, *Osguthorpe v. Wolf Mountain Resorts, LC*, 2010 UT 29, ¶ 10, 232 P.3d 999, and "indulge[] all reasonable inferences" in favor of the non-moving party, *Haik v. Salt Lake City Corp.*, 2017 UT 14, ¶ 7, 393 P.3d 285 (citation and internal quotation marks omitted). A district court should grant a motion to dismiss only if it is clear from the allegations that the non-moving party would not be entitled to relief under the set of facts alleged or under any facts it could prove to support its claim. *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 14, 243 P.3d 1275.[3]

---

3. The Act contains a requirement that any petition filed thereunder "shall include detailed facts supporting the petitioner's right to file the petition including the criteria set forth in Subsection (2) and residency information as set forth in Section 78B-13-209." *See* Utah Code Ann. § 30-5a-103(5). We are not asked to determine, and therefore do not opine upon, whether this statutory provision imposes special pleading burdens upon petitioners that would require us to employ a standard of review different from the standard generally applied to review of decisions granting motions to dismiss.

We review a district court's ruling on a motion to dismiss for correctness. *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 10, 266 P.3d 702.

ANALYSIS

¶11    The Act itself recites that "it is the public policy of this state that parents retain the fundamental right and duty to exercise primary control over the care, supervision, upbringing, and education of their children." Utah Code Ann. § 30-5a-103(1). This statutory proclamation is in line with United States Supreme Court precedent declaring that parents have a fundamental constitutional right to parent their children. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000) (recognizing that "the Due Process Clause of the Fourteenth Amendment [of the United States Constitution] protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children").[4] Pursuant to this fundamental right, the terms of the Act acknowledge "a rebuttable presumption that a parent's decisions are in the child's best interests." *See* Utah Code Ann. § 30-5a-103(1). However, a parent's fundamental right to raise a child is not absolute. "A parent's rights must be balanced against the state's important interest in protecting children from harm." *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 74, 250 P.3d 465 (citing *In re J.P.*, 648 P.2d 1364, 1377 (Utah 1982)). To protect a child from harm, a court may remove a child from the child's home and place the child in the protective custody of the State, *see* Utah Code Ann. § 78A-6-302(1) (LexisNexis Supp. 2017), or even go so far as to "terminate all parental rights" if certain criteria are met, *see id.* § 78A-6-507(1)(a)–(i) (LexisNexis 2012).

---

4. Father has not asserted that the Act is unconstitutional, and therefore we confine our analysis to the terms of the Act itself.

¶12 Similarly, "every state in the nation has enacted some form of a non-parent visitation statute" that allows, under certain circumstances, a non-parent to gain custodial or visitation rights, even without going so far as to terminate the legal parents' rights. *See* Holly M. Davis, *Non-Parent Visitation Statutes: Was* Troxel v. Granville *Their Death-Knell?*, 23 Whittier L. Rev. 721, 736 (2002) (collecting various statutes that provide an opportunity for non-parents to establish visitation or custody rights). The enactment of these statutes is due, in part, to "the 'recognition of [the] changing realities of the American family.'" *Id.* at 737 (alteration in original) (quoting *Troxel*, 530 U.S. at 64). Utah is no exception; in 2008, our legislature enacted the Act, creating a pathway for non-parents, under limited circumstances, to win an order of custody or visitation regarding children who are not legally theirs.

¶13 Under the Act, the requirements imposed upon petitioners are understandably onerous. A court "may find" the parental presumption rebutted, and "grant custodial or visitation rights to a person other than a parent," only if the petitioner proves, by clear and convincing evidence, that seven requirements are met. *See* Utah Code Ann. § 30-5a-103(2). The first six of these requirements concern the petitioner's relationship with the child, *see D.A. v. D.H.*, 2014 UT App 138, ¶ 9, 329 P.3d 828 (stating that "[t]he first six factors . . . require the court to examine the nature and quality of the relationship between the child and the non-parent"), and require the petitioning non-parent to prove the following:

> (a) the person has intentionally assumed the role and obligations of a parent;
>
> (b) the person and the child have formed an emotional bond and created a parent-child type relationship;

> (c) the person contributed emotionally or financially to the child's well being;
>
> (d) assumption of the parental role is not the result of a financially compensated surrogate care arrangement;
>
> (e) continuation of the relationship between the person and the child would be in the child's best interests; [and]
>
> (f) loss or cessation of the relationship between the person and the child would be detrimental to the child.

Utah Code Ann. § 30-5a-103(2)(a)–(f). The seventh factor, by contrast, concerns the status of the child's current legal parent. *See D.A.*, 2014 UT App 138, ¶ 14 (stating that "'the parent' in subsection (2)(g) unambiguously refers to the parent whose presumption is being challenged"). To meet this seventh requirement, the petitioner must demonstrate that the legal parent either (a) "is absent," or (b) "is found by a court to have abused or neglected the child." Utah Code Ann. § 30-5a-103(2)(g). If the petitioner successfully demonstrates the existence of all seven factors, then the court "may" award the petitioner custodial or visitation rights. *Id.* § 30-5a-103(2).

A

¶14    We begin our analysis by examining the first six factors—the ones concerning the relationship between Stepfather and the Children. Although the district court did not discuss these factors (because the district court believed that the seventh requirement was not met), Father nonetheless invites us to affirm the district court's decision on the alternative ground that Stepfather has also not alleged facts sufficient to meet the first six requirements. We decline this invitation.

¶15    In his Petition, Stepfather alleges that he has "assumed the role and obligations of the minor children's father"; has "provided exclusive care for the minor children"; has "developed an emotional bond and a parent-child relationship" with the Children; and has "emotionally and financially cared for the minor children." These allegations are sufficient to meet the first three requirements. *See id.* § 30-5a-103(2)(a)–(c) (requiring that the non-parent assume the "role and obligations of a parent," "form[] an emotional bond and create[] a parent-child type relationship," and "contribute[] emotionally or financially to the child's well being"). Further, Stepfather alleges that he "has not been compensated for caring for the minor children," an allegation sufficient to satisfy the fourth requirement that there be no "financially compensated surrogate care arrangement." *See id.* § 30-5a-103(2)(d). Finally, the Petition asserts "that continuation of the relationship with the minor children is in the minor children's best interest and the loss of this relationship would be detrimental to the minor children." This allegation meets the final two requirements relating to the parent-child relationship. *See id.* § 30-5a-103(2)(e), (f) (requiring the non-parent to show that "continuation of the relationship . . . would be in the child's best interest" and that "loss or cessation of the relationship . . . would be detrimental to the child").

¶16    As noted, given the procedural posture of the case, we must assume that all of these allegations are true. Accordingly, we are satisfied that Stepfather has alleged facts that, if proven, would satisfy the first six requirements of the Act.

B

¶17    Next, we turn to the question of whether Stepfather has alleged facts sufficient to satisfy the Act's seventh requirement, pursuant to which Stepfather must demonstrate that Father either (a) "is absent," or (b) "is found by a court to have abused or neglected the child." *Id.* § 30-5a-103(2)(g). In order to reach a decision on this question, we must first ascertain the meaning of

those phrases (neither of which are separately defined in the Act). After arriving at a definition of those phrases, we will examine Stepfather's Petition to determine whether the allegations set forth there are sufficient to survive Father's motion to dismiss.

1

¶18 The phrase "is absent" contains two words—"is" and "absent"—and both require our attention. One might think that the word "is" is plain enough on its face, but as our supreme court recently noted in a case almost entirely devoted to an exploration of the word's definition, the question of "what the meaning of the word 'is' is" was complicated enough to "capture[] the nation's attention" back in 1999. *See Scott v. Scott*, 2017 UT 66, ¶ 1 (internal quotation marks omitted). Fortunately for our analysis, we have guidance from our supreme court on the question.

¶19 In *Scott*, our supreme court was asked to explore the meaning of the term "is cohabitating," as that term is used in a different section of Title 30 of the Utah Code. That statute states that alimony obligations terminate if the payor spouse can establish that the payee spouse "*is* cohabitating with another person." *See* Utah Code Ann. § 30-3-5(10) (LexisNexis Supp. 2017) (emphasis added). In *Scott*, the payee spouse had apparently been living with another person, and the payor spouse believed this relationship amounted to cohabitation. *See Scott*, 2017 UT 66, ¶ 3. However, the payee spouse ended the cohabiting relationship "months before [the payor spouse] filed his motion" to terminate alimony payments. *Id.* At the time the motion to terminate alimony was filed, the payee spouse was not cohabiting with any other person. On those facts, both the district court and this court determined that the payee spouse had cohabited, and that alimony payments should terminate as a result of the past cohabitation. *Id.* ¶ 1.

¶20 The supreme court reversed, however, and declared, in a Seussian burst of anapestic tetrameter,[5] that "*is* should mean *is* and not *was* or *has been*." *Id.* The court carefully examined the tense of the verb used by the legislature, and determined that, "[i]n light of the statute's plain language, we cannot see how a showing of anything less than *present* or *ongoing* cohabitation meets the statute's terms head-on." *Id.* ¶ 23. The court continued its analysis by concluding that "[t]he present tense *is* demands the condition to be present at the time the paying spouse declares before the court that a former spouse *is* cohabiting," and "[t]hat declaration takes place on the date of filing" of the motion to terminate alimony. *Id.* ¶ 30. Because any cohabitation had ceased prior to the time of filing, the supreme court held that the payor spouse's motion to terminate did not meet the requirements of the statute and that alimony payments must continue.

¶21 We perceive no material differences—indeed, no differences at all—between the manner in which the word *is* is used in the alimony statute and the manner in which that same word is used in the Act. Accordingly, *Scott* requires us to interpret the word *is* in the phrase "is absent" in the same way. In the Act, the legislature used the same present tense form of the verb "to be" as it used in the alimony statute. There, as here, "*is* should mean *is* and not *was* or *has been*." *Id.* ¶ 1. In *Scott*, the date from which this present-tense inquiry was taken was the

---

5. Illustrative examples from Dr. Seuss's writings abound, but one that somehow seems apt here, given the discussion about plain meaning, is Horton's declaration that:

> I meant what I said
> And I said what I meant . . .
> An elephant's faithful
> One hundred per cent!

Dr. Seuss, *Horton Hatches the Egg* 16, 21, 26, 38 (1940).

date of the filing of the motion to terminate alimony—the date that the "paying spouse declares before the court that a former spouse *is* cohabiting." *Id.* ¶ 30. Here, the operative date is the date of the filing of Stepfather's Petition—the date Stepfather declared before the court that Father "is absent." Thus, to succeed on his Petition, Stepfather must allege—and eventually prove—that Father was "absent" as of December 1, 2015, the date Stepfather filed his Petition.

¶22 We emphasize that this is not a backward-looking inquiry.[6] It is a snapshot in time, taken on December 1, 2015, and

---

6. The district court appeared to presume that a backward-looking inquiry was required; indeed, the court rested its decision on the allegation that Father had periodically visited the Children in the past and therefore could not be considered "absent." This notion is supported by dicta in our decision in *D.A. v. D.H.*, 2014 UT App 138, ¶¶ 15–18, 329 P.3d 828. There, we discussed certain comments made by legislators during the passage of the Act, some of which appeared to envision a backward-looking inquiry into a parent's "absence." *Id.* ¶ 16 (referencing comments by Sen. Hillyard). We acknowledge some inconsistency between our conclusion today and the dicta in *D.A. v. D.H.* We are, however, constrained by the supreme court's more recent decision in *Scott*, which commands a plain language analysis, even if we have reason to believe that the legislature may have intended something different than what the plain language dictates. *See Scott v. Scott*, 2017 UT 66, ¶¶ 26, 28 (stating that "we start from the premise that we should discern what the legislature intended from the plain language of the text unencumbered by notions of what we think the legislature must have wanted the language to accomplish," and that "it is our obligation to take the plain language at face value and trust the legislature to amend the statute if it intended a different result"); *see also Smith v. Price Dev. Co.*, 2005 UT 87, ¶ 16, 125 P.3d 945

(continued…)

examining whether, on that date, Father was "absent." Because it is a present-tense, snapshot-in-time inquiry, evidence of Father's past actions will be of only tangential relevance[7] in conducting that inquiry.

¶23    Having determined that a parent's "absen[ce]" must be analyzed in present-tense fashion, as of the date of the filing of a petition under the Act, we must now turn to the question of what "absent" means. When we interpret statutory language, "our primary goal" is to ascertain the "true intent and purpose of the Legislature." *Rent-A-Center West, Inc. v. Utah State Tax Comm'n*, 2016 UT 1, ¶ 13, 367 P.3d 989 (citation and internal quotation marks omitted).

¶24    If the Act itself had a definition of "absent," we would of course look there first. *See State v. Rasabout*, 2015 UT 72, ¶ 43, 356 P.3d 1258 (Lee, J., concurring) (stating that a "threshold question" in statutory interpretation "is whether the legislative text conveys some specialized meaning" such as "a statutorily defined term, a scientific phrase, or a legal term of art" and, if it

---

(…continued)
(stating that courts "may turn to secondary principles of statutory construction or look to a provision's legislative history only if [courts] find the provision ambiguous").

7. By "tangential relevance," we refer to situations where evidence may be helpful to set the stage or to paint a more complete background picture of the parties' situation in aid of explaining how the present-tense circumstances that are alleged to constitute "absence" came to be. Such background information is likely admissible, and may even be essential as a practical matter to assist the factfinder in completely understanding the parties' situation, but it does not directly bear on the question of whether a legal parent "is absent" as of the date a petition is filed.

does, "the specialized meaning controls"). Here, the Act does not provide a separate definition of the term "absent," and we are unaware of any specialized meaning of the term that ought to apply. In such cases, we must interpret the statutory language "according to the 'plain' meaning of [its] text." *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465; *see also Anadarko Petroleum Corp. v. Utah State Tax Comm'n*, 2015 UT 25, ¶ 11, 345 P.3d 648 (stating that "[w]hen interpreting a statute, we look first to the plain and ordinary meaning of its terms"); *Reynolds v. Bickel*, 2013 UT 32, ¶ 10, 307 P.3d 570 (stating that "[t]he best evidence of the legislature's intent is the plain language of the statute itself" (citation and internal quotation marks omitted)).

¶25　A "starting point" for a court's "assessment of ordinary meaning is the dictionary." *See State v. Bagnes*, 2014 UT 4, ¶ 14, 322 P.3d 719. In this case, there is remarkable uniformity among dictionaries as to the definition of the word in question. All dictionaries that we consulted, or that were brought to our attention during this case, define "absent," first and foremost, as "not present." *See*, *e.g.*, *Absent*, Cambridge English Dictionary, dictionary.cambridge.org/us/dictionary/english/absent [https://perma.cc/2FS7-XF2B] ("not present" or "not in the place where you are expected to be"); *Absent*, English Oxford Living Dictionaries, en.oxforddictionaries.com/definition/absent [https://perma.cc/CJ5L-9XBK] ("not present in a place, at an occasion, or as part of something"); *Absent*, Merriam-Webster, www.merriam-webster.com/dictionary/absent [https://perma.cc/DME2-BNZP] ("not present at a usual or expected place"); *Absent*, New Oxford American Dictionary 6 (3d ed. 2010) ("not present in a place"); *Absent*, Webster's Third New Int'l Dictionary 6 (1993) ("not present or not attending").[8]

---

8. Even the infamous Urban Dictionary concurs, defining "absent" as "the state of not being where you are supposed to be." *See Absent*, Urban Dictionary, www.urbandictionary.com/

(continued…)

¶26　When a term is not defined within a particular section of the Utah Code, courts may also look to other sections of the Utah Code to see whether the same term is defined elsewhere. *See Wasatch Crest Ins. Co. v. LWP Claims Adm'rs Corp.*, 2007 UT 32, ¶ 13, 158 P.3d 548 (stating that "[a]lthough the Utah Insurance Code does not define the term 'distribution,' the term is defined elsewhere in the Utah Code"); *see also LeBeau v. State*, 2014 UT 39, ¶ 34, 337 P.3d 254 (stating that "[t]hough the Legislature did not specifically define 'interests of justice' in the aggravated kidnapping statute, it has provided guidance elsewhere in the Utah Code"). There are several places in the Utah Code—outside of the Act—where the legislature has defined the word "absent" and, as with the dictionary definitions, each time the legislature has defined "absent" it has done so, in context, to essentially mean "not present." *See* Utah Code Ann. § 53-2a-802(1)(a)(i) (LexisNexis Supp. 2017) (defining "absent" in the Emergency Interim Succession Act as "not physically present or not able to be communicated with for 48 hours"); *id.* § 53A-11-101(1)(a) (LexisNexis 2016) (defining "absent" in the educational context

---

(…continued)

define.php?term=Absent　[https://perma.cc/8QAT-TYN3].　We recognize that our search for various meanings of the word "absent" is not as thorough as that advocated by proponents of "corpus linguistics," *see State v. Rasabout*, 2015 UT 72, ¶ 57, 356 P.3d 1258 (Lee, J., concurring) (defining "corpus linguistics" as "access[ing] large bodies of real-world language to see how particular words or phrases are actually used in written or spoken English," and advocating for its more widespread use in judicial decision-making), but we note that where the Cambridge and Oxford Dictionaries, on the one hand, and the Urban Dictionary, on the other hand, both agree upon the basic meaning of a word, we can be fairly confident that we have arrived at the meaning of the word that is "actually used in written or spoken English." *See id.*

as the "failure of a school-age minor assigned to a class or class period to attend the entire class or class period"); *id.* § 10-3-301(1)(a) (LexisNexis Supp. 2017) (defining "absent" in the Municipal Code as where a "municipal officer fails to perform official duties, including the officer's failure to attend each regularly scheduled meeting that the officer is required to attend").

¶27    Based on these authorities, we conclude that the word "absent" means "not present," and that a parent "is absent," as that term is used in context in the relevant section of the Act, if the parent is not present for the purpose of parenting the child. There could be various forms that such "absence" might take. A parent who is incarcerated or hospitalized (or in drug or alcohol rehabilitation) on a long-term basis may fit the definition of "absent," because such a parent may not be able to be present for the purpose of parenting the child. Alternatively, a parent who simply does not wish to parent the child, even if that parent is physically residing in close proximity and is otherwise able to parent the child, may also be "absent" as that term is used in the Act. On the other side of the coin, however, a parent who, at the time of the filing of a petition under the Act, is present and willing to parent the child will usually not meet the definition of "absent."[9]

---

9. We have purposefully not referenced the word "fit" in describing the definition of the word "absent," because we do not think the "absence" inquiry was intended to devolve into litigation over parental fitness. If the legislature had intended a present and willing but otherwise unfit parent to meet the requirements of subsection (g)(i), it could have used a word other than "absent," or at a minimum added language to that effect. Its decision not to include any direct language about parental fitness must be presumed to have been intentional. *See Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 14, 267 P.3d

(continued…)

¶28　The question of whether a parent "is absent" is a question of fact that will ordinarily be reserved for the factfinder. We note also that the burden of demonstrating that a parent "is absent" falls upon the petitioner, and that this burden requires proof by clear and convincing evidence. *See* Utah Code Ann. § 30-5a-103(2) (stating that custody or visitation rights may be afforded to a person "who, by clear and convincing evidence, has established all" seven requirements).

¶29　This simple and straightforward interpretation of the word "absent" appears to us to be in line with the policy considerations that motivated passage of the Act. A legal parent's rights are fundamental. *Id.* § 30-5a-103(1). Legal parents retain constitutional privileges "to exercise primary control over

---

(…continued)

863 (stating that "we assume, absent a contrary indication, that the legislature used each term [in a statute] advisedly," that "the expression of one term should be interpreted as the exclusion of another," and that courts "seek to give effect to omissions in statutory language by presuming all omissions to be purposeful" (citation and internal quotation marks omitted)). Indeed, there are other statutory avenues available to a non-parent who believes that a legal parent is unfit. The second part of subsection (g), for instance, allows a petitioner to meet the Act's seventh requirement by demonstrating that the legal parent "is found by a court to have abused or neglected the child." *See* Utah Code Ann. § 30-5a-103(2)(g)(ii). And there are other statutory options, apart from the Act itself. *See, e.g., id.* § 78A-6-304 (LexisNexis 2012) (allowing "any interested person" to file a petition seeking intervention by the Division of Child and Family Services, a petition that may be granted for reasons including parental abuse or neglect); *id* § 78A-6-507(c) (allowing a petitioner to seek termination of a parent's rights if that parent is "unfit or incompetent").

the care, supervision, upbringing, and education of their children," and "[t]here is a rebuttable presumption" that a legal parent's decisions "are in the child's best interests." *Id.* Unless the legal parent's rights are terminated, that parent has the primary right to parent the child, a right that ordinarily trumps any interest claimed by stepparents, grandparents, or any other interested non-parent. *See, e.g., Jones v. Barlow*, 2007 UT 20, ¶ 39, 154 P.3d 808 (stating that "[i]t is a fundamental tenet of our common law that the only persons having any actually vested interest in the custody of a child cognizable by the law are the parents," and that "[o]ther relatives of a child merely have some dormant or inchoate right or interest in the custody and welfare of children that matures only upon the death or termination of the rights of the parents" (citation and internal quotation marks omitted)). The Act was enacted to create a pathway for non-parents to obtain legal rights of custody and visitation, but only in situations where the legal parent "is found to have abused or neglected the child," or where the legal parent "is absent." *See* Utah Code Ann. § 30-5a-103(2)(g). In situations where a legal parent has not been found to have abused and neglected his child, and where that parent is present and willing to parent the child, the legal parent's rights are properly prioritized. It is therefore entirely in keeping with these principles for the Act to apply only in situations where the legal parent is not present for the purpose of parenting the child, or where the legal parent is found to have abused or neglected the child.

¶30   In summary, then, to demonstrate that a legal parent "is absent" under the Act, the petitioner must prove, by clear and convincing evidence, that at the time the petition was filed the legal parent was not present for the purpose of parenting the child.

2

¶31   A petitioner can also satisfy the Act's seventh requirement by demonstrating that the parent "is found by a court to have

abused or neglected the child." *See id.* § 30-5a-103(2)(g)(ii). As with the "is absent" option, the first word of the statutory language is the present-tense verb *is*. We see no reason to interpret the word *is* in one option any differently than in the other. Accordingly, for the reasons set forth above, we conclude that, in order to meet this element, a petitioner must be able to allege and prove that, at the time of the filing of the petition, the parent *is* at that point already "found by a court to have abused or neglected the child."

¶32    It follows from this conclusion that the determination of "abuse" or "neglect" must already have been made, most likely by either a juvenile court or another district court.[10] The statute does not contemplate that a determination of abuse or neglect can be made in the context of, and at the conclusion of, an action filed pursuant to the Act. This conclusion is not only compelled by the legislature's use of the present-tense verb *is*, but is also bolstered by the legislature's use of the phrase "found by a court." Findings are always made by judicial or quasi-judicial tribunals, and there is no need to specify—if the findings are to be made in the context of the case initiated by the petition—that the findings must be made by a court. Indeed, if the legislature had intended for the finding of abuse or neglect to be made in the context of the newly-filed petition, the legislature could easily have so indicated by simply stating that the seventh

---

10. For this reason, we need not concern ourselves here with ascertaining the specific definition of "abuse" or "neglect" under the Act. Because any determination of "abuse" or "neglect" must have already been made before the filing of any petition under the Act, a court—potentially even a court in another state—will have already applied definitions of those terms from other contexts, presumably using the definitions similar to those found in Utah's Juvenile Court Act. *See* Utah Code Ann. § 78A-6-105(1) (LexisNexis Supp. 2017) (abuse); *id.* § 78A-6-105(27) (neglect).

requirement could be met if the parent "has abused or neglected the child." The legislature's careful use of the phrase "is found by a court to have abused or neglected the child" connotes an intent that this finding had to have been made by a court prior to the filing of the petition.

¶33    Accordingly, if a determination of abuse or neglect has not already been made by a court at the time of the filing of the petition, then the parent is not "found by a court to have abused or neglected the child."

3

¶34    Now that we have ascertained the definitions of the relevant terms, we must examine Stepfather's Petition to determine whether Stepfather adequately alleged facts that might satisfy the Act's seventh requirement.

¶35    Clearly, Stepfather has not pleaded allegations sufficient to succeed on the "abuse or neglect" alternative. Stepfather alleged in the Petition that Father "has neglected the minor children by leaving them in [Stepfather's] care since 2007 and not providing for their emotional or physical needs." However, he nowhere alleges that a court had previously found Father "to have abused or neglected the child[ren]." *See* Utah Code Ann. § 30-5a-103(2)(g)(ii). Thus, the Petition failed to allege sufficient facts to meet the statutory requirements on that ground.

¶36    The Petition does, however, allege sufficient facts to assert that Father was "absent" on December 1, 2015, the time of the filing of the Petition. Chief among those are the allegations found at paragraph twenty-two of his petition, where Stepfather alleges that Father "has been absent from the minor children's lives," and has left "them in [Stepfather's] care since 2007." While stated in a backward-looking way, the use of the phrase "since 2007" may suggest that Stepfather believes the situation is ongoing and has not changed over the years. This allegation—

viewed generously and in a light most favorable to Stepfather—could possibly mean that Father was and remains absent, even as of the time of the filing of the Petition. In addition, of some potential relevance are Stepfather's present-tense allegations that Father "is incapable" of caring for the Children, and that Father "does not have a stable residence" at which the Children can reside. Taken together, and viewed in the light most favorable to Stepfather, the allegations contained in the Petition are sufficient to state a claim that Father was "absent" at the time the Petition was filed. As a result, the district court should not have granted Father's motion to dismiss on this ground.

¶37    Specifically, the district court's singular focus on Father's previous visits was incorrect. Even assuming that Father regularly visited the Children in the past, and that he was perfectly ready, willing, and able to parent the Children in the past, he can still be considered "absent" under the Act if, as of the date of the filing of the Petition, he was no longer present for the purposes of parenting the Children. *Cf. Scott*, 2017 UT 66, ¶ 10 (holding that a spouse who had previously cohabited, but was no longer cohabiting at the time of the filing of the operative motion, could continue to receive alimony payments).

¶38    We express no opinion about whether Stepfather will ultimately be able to succeed on the merits of his claim that Father was "absent" as of December 1, 2015. Many of Stepfather's allegations are backward-looking assertions about Father's previous relationship with the Children that, as noted, bear only a tangential relationship to the relevant inquiry. Further proceedings are necessary to ascertain whether Stepfather's allegation that Father "has been absent from" the Children's lives "since 2007" was intended to include present-tense allegations. Likewise, it is unclear whether Stepfather's present-tense allegations that Father "is incapable" of parenting the Children and that Father "does not have a stable residence" are intended to assert "absence" as the Act defines it. If by these allegations Stepfather intends to assert that Father, despite his

willingness to parent the Children, is simply an unfit parent who should not be allowed to do so, that allegation will be insufficient because it does not go to "absence." On the other hand, if the allegations are intended to convey that Father "is incapable" of parenting the Children and that he has no "stable residence" because he is not present for some reason, those allegations may state facts that might help Stepfather prove that Father "is absent." We note that Father's appearance in this case, and his active defense of it, tends to indicate that he may very well be present and willing to parent the Children, but all such factual issues are beyond the scope of this appeal. Ultimately, we cannot predict whether Stepfather will succeed in his endeavor to win an order of custody or visitation under the Act. Certainly, the Act's requirements are onerous and strict, as one would expect given the law's entirely appropriate concern for the rights of legal parents. But all we are asked to determine here is whether Stepfather has pleaded facts sufficient to survive a motion to dismiss, and we conclude that he has.

CONCLUSION

¶39   Stepfather has alleged facts that, if later proven to be true, could potentially satisfy all seven of the Act's requirements. Accordingly, his Petition should not have been dismissed for failure to state a claim. We therefore reverse the district court's order, and remand this case to the district court for further proceedings consistent with this opinion.

_____